UNITED STATES DISTRICT COURT
NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION

| | |
|---|---|
| MARY SESTAK, ) | |
| ) | |
| Plaintiff, ) | |
| ) | |
| v. ) | No. 16 C 6354 |
| ) | |
| NORTHWESTERN MEMORIAL ) | Judge Rebecca R. Pallmeyer |
| HEALTHCARE, an Illinois not-for-profit ) | |
| corporation ) | |
| Defendant. ) | |

## MEMORANDUM OPINION AND ORDER

Plaintiff Mary Sestak worked as a staff nurse at Northwestern Memorial Hospital from 2000 until 2013. Defendant Northwestern Memorial Healthcare (NMH) terminated Sestak's employment after she accessed the medical records of an infant in the neonatal intensive care unit ("NICU") and provided that infant with "touch therapy." NMH argues that it fired Sestak because it concluded that she violated the Health Insurance Portability and Accountability Act of 1996, NMH's Privacy and Confidentiality Policy, and NMH's Rules of Personal Conduct by "perform[ing] work outside the scope" of her employment. Sestak argues that these rationales are pretextual and that Defendant in fact terminated her on the basis of her age in violation of the Age Discrimination in Employment Act of 1967, 29 U.S.C. §§ 621-34. Defendant has moved for summary judgment on this claim, but the court concludes that there are genuine disputes of fact regarding Defendant's motives for her discharge.

## BACKGROUND

Mary Sestak was born on November 27, 1958. (Def.'s Local Rule 56.1 Statement of Material Facts [58] (hereafter "Def.'s SOF") ¶ 1.) She holds a B.S. degree in agriculture and an associate's degree in nursing. (Decl. of Mary Sestak (hereafter "Sestak Decl.") ¶ 1, Ex. 3 to Pl.'s Statement of Material Facts [63] (hereafter "Pl.'s SOF").) She has been licensed as a nurse since June 1985, qualified to work in the areas of labor and delivery. (*Id.*)

Beginning on August 4, 2000, Sestak worked for NMH as a staff nurse in the labor and delivery department. (Def.'s SOF ¶ 1.) Although the parties dispute whether Sestak ever received informal criticism of her performance, they agree that all her formal performance evaluations were positive. (Pl.'s SOF ¶¶ 4-5; Def.'s Resp. to Pl.'s Statement of Material Facts [84] (hereafter "Def.'s Resp. to Pl.'s SOF") ¶ 4-5.) These evaluations stated, variously, that Sestak "[a]ssesses and cares for patients safely," "[p]rovides competent patient care," "[p]rovides safe patient care," "[d]emonstrates compliance with patient care policies," and "[p]ractices accountability using nursing process." (Pl.'s SOF ¶ 4.) They also stated that Sestak was a "[g]reat RN with lots of experience, 27 plus years" who "[l]oves bedside nursing." (*Id.*) Sestak received several pay raises during her tenure at NMH. (*Id.*)

Despite these positive evaluations, Sestak perceived an attitude among some in her Department that "older nurses were taking too long with the patients." (Deposition of Mary Sestak (hereafter "Sestak Dep.") 75:23-24, Ex. 1 to Pl.'s SOF.) At one meeting with her supervisors Kim Armour and Melissa Kelley, for example, Sestak remembers an unidentified individual stating that "older nurses would have difficulty" complying with new guidelines relating to the speed at which patients should be moved "out of labor in delivery," because older nurses "are too slow and spend too much time with patients." (Sestak. Decl. ¶ 10.)[1] Defendant denies that any such statement was made (Def.'s Resp. to Pl.'s SOF ¶ 10) and maintains that any age-related comments plaintiff overheard prior to November 13, 2013, were made by non-supervisory employees. (Def.'s SOF ¶ 50.)

The parties also dispute whether the attitude Sestak describes led to any differential treatment of older nurses at NMH. (Pl.'s SOF ¶ 10; Def.'s Resp. to Pl.'s SOF ¶ 10.) Sestak

---

[1] Defendant moves to strike paragraph 10 of Plaintiff's declaration as not based on personal knowledge. (Def.'s Reply in Supp. of Mot. to Strike [91] 12.) Plaintiff's use of the passive voice in paragraph 10 leaves the court uncertain whether she herself attended the meeting in question, and therefore whether her testimony regarding the alleged statement is based on personal knowledge. To introduce this testimony at trial, Plaintiff must provide foundation evidence demonstrating her personal knowledge of the statement.

2

claims that "older" nurses were often "given really difficult assignments." (Sestak Dep. 159:1.) She recounts one incident in which a charge nurse assigned "a very large patient" to Sestak, rather than "any of the younger nurses that had come up in the queue." (Sestak Dep. 82:20-83:6.)[2] On another occasion, Sestak was assigned "a prostitute who was a drug seeker" because other nurses viewed that patient as "undesirable." (*Id.* 160:7-20.)

Sestak further claims that she "observed younger nurses not being disciplined or being less harshly disciplined for things that older nurses were disciplined for." (Pl.'s SOF ¶ 12.) She testifies that "younger people at the hospital" regularly violated policies prohibiting employees from conducting personal business during worktime. (Sestak Dep. 160:16-22.) "They always have their iPhones out, and no one says anything," Sestak claims. (*Id.*)

NMH disputes Sestak's general allegations of disparate treatment. (Def.'s Resp. to Pl.'s SOF ¶¶ 10-12.) It asserts that of the fifteen employees in Sestak's Department who "separated employment" with NHM in 2013, "only one (1) was over forty (40) years old—Plaintiff." (Def.'s SOF ¶ 55.) But this statistic is not particularly illuminating, as it appears that of those individuals, Plaintiff was the only one terminated by NMH for cause or disciplinary reasons. (Pl.'s SOF Ex. 12.)[3]

## I.     Events leading to Sestak's termination

On November 5, 2013, Sestak was assigned to care for a patient in the labor and delivery unit who eventually gave birth to twins after Sestak's shift ended. (Def.'s SOF ¶¶ 10-

---

[2] The charge nurse (Emily Pro) "actually made this patient wait until I got there," and then "ridicule[d] the patient and kind of ma[d]e fun of me for having to take the patient." (Sestak Dep. 83:3-6.) Sestak told Pro that "[y]ou shouldn't be talking like this about any patient because . . . patients are people." Pro responded, "Oh Mary, you're just an old hippy." (*Id.* at 83:7-9.)

[3] Defendant disputes Plaintiff's assertion on this topic, which appears to include a typo. Plaintiff states that "Pl. [rather than Defendant] did not fire any other nurses for cause in LD in 2013." (Def.'s Resp. to Pl.'s SOF ¶ 40; Pl.'s SOF ¶ 40.) Defendant does not appear to dispute the thrust of Plaintiff's position: that "[n]one of the nurses under the age of 40 were 'terminated' for cause or disciplinary reasons." (Pl.'s Opp. to Def.'s Statement of Undisputed Material Facts [63] (hereafter Pl.'s Opp. to Def.'s SOF") ¶ 56.)

3

12.) The parties dispute whether Sestak was also "assigned" to care for the twins while their mother was in labor. (Def.'s Resp. to Pl.'s SOF ¶ 14.) Sestak claims that she was assigned to care for both the mother and the unborn babies during this time. (Pl.'s SOF ¶ 14.)[4] Defendant suggests that Plaintiff was assigned only to care for the mother, but Defendant has not identified another nurse as having been assigned to care for the unborn twins, nor has Defendant suggested that a nurse caring for a woman in labor has no responsibility for the unborn baby. (Def.'s SOF ¶ 10.) In any event, Sestak asserts that she "charted on medical records of both babies," as well as their mother, while they were in the labor and delivery unit. (Pl.'s SOF ¶ 14.) She also asserts that she "bonded" with both the mother and father of the twins over a discussion of their "mutual belief in the power of touch therapy—that it was good for brain development, weight gain, [and] balance development." (Pl.'s SOF ¶ 15.)[5] At the father's request, Sestak gave him her telephone number when her shift ended on November 5. (Def.'s SOF ¶ 11.)

The mother gave birth to twins the next day, while Sestak was not at work. (Def.'s SOF ¶ 12.) After delivery, one of the twins was taken to the neonatal intensive care unit ("NICU") at NMH. (*Id.*) On November 9, 2013, the infants' father called Sestak and asked her questions

---

[4] Defendant moves to strike this claim on the grounds that it conflicts with Sestak's deposition testimony. (Def.'s Reply in Supp. of Mot. to Strike 11.) This motion is denied. Sestak testified at her deposition that she was "assigned to [the mother]" and "had to chart on the babies." (*Id.* at 38:19-22.) In her declaration, Sestak states that "I was assigned to be a nurse for [the mother] and her twin babies." (Sestak Decl. ¶ 13.) The fact that Sestak testified in her deposition that she was "assigned to [the mother]" does not, on its own, suggest that she was *not* "assigned" to the mother's unborn babies as well. Nor does Sestak's failure to use the word "assigned" when discussing her duties toward the unborn babies conflict with the statement in her declaration that she was "assigned" to both the mother "and her twin babies."

[5] Defendant moves to strike this statement, urging that the mother's "beliefs about the power of touch therapy are . . . inadmissible hearsay." (Def.'s Resp. to Pl.'s SOF ¶ 15.) This motion is denied. Insofar as Plaintiff seeks to introduce the mother's and father's statement about their beliefs, she does not do so for the purpose of proving the truth of those statements–that is, that the mother and father actually believed in the power of touch therapy– but rather "as an explanation of the rationale for her own actions." (Pl.'s Resp. to Def.'s Mot. to Strike [90] 6.)

4

about the infant being treated in the NICU. (Pl.'s SOF ¶ 16.)[6] Sestak told the father that she would look at the infant's medical chart, and he responded by saying "ok." (*Id.*)[7] Sestak then "briefly" examined the infant's chart "only to see what had happened in the delivery." (*Id.*) Sestak claims she did not share the information from the infant's chart with anyone. (*Id.*) Defendant disputes this assertion based on an electronic report created on the morning of November 13, 2013, by NICU nurse Moira Hoelting. (Def.'s Resp. to Pl.'s SOF ¶ 16.) According to that report, which Hoelting prepared at the request of NICU charge-nurse Courtney Sypult and NICU manager Diane Stonner, Sestak told Hoelting on November 12 that "she had been reading the MRI and test results in the chart and asked specific questions regarding

---

[6] Defendant moves to strike paragraph 16 of Plaintiff's Statement of Facts on the grounds that "the cited material does not support the allegations." (Def.'s Resp. to Pl.'s SOF ¶ 16.) Defendant also argues that the father's alleged statements during this conversation are inadmissible hearsay. (*Id.*) This motion is denied. Contrary to Defendant's contention that Sestak "provides no evidence regarding whether father called Plaintiff on November 9, 2013" (*Id.*), Plaintiff clearly cites paragraph 14 of Sestak's declaration, which states that "Father called me on November 9, 2013, and asked me what I thought about Baby A's condition." (Sestak Decl. ¶ 14.) NMH also argues that the father did not, in fact, "request[] Plaintiff to look into the baby's medical chart." (Def.'s Resp. to Pl.'s SOF ¶ 16.) But Plaintiff does not claim that the father asked her to look at the baby's medical chart. Rather, she claims that the father asked her about the baby's condition and that, when she offered to look at the baby's chart, he agreed. (Pl.'s SOF ¶ 16.) Finally, NMH argues that "what Father said is inadmissible hearsay" (Def.'s Resp. to Pl.'s SOF ¶ 16), in that "Plaintiff only offered her own testimony repeating what Infant's parents told her" and did so "to prove the truth of the matter asserted, namely that Plaintiff had permission from Infant's parents to access Infant's medical records on November 9, 2013." (Def.'s Reply in Supp. of its Mot. to Strike [91] 8.) The father's questions to Plaintiff do not appear to be statements of fact offered for their truth; to the extent they are hearsay at all, they appear to fall into the exception for statements made for the purpose of obtaining medical diagnosis or treatment. *See* FED. R. EVID. 803(4)(A); *Lovejoy v. United States*, 92 F.3d 628, 632 (8th Cir. 1996) (hearsay statements of child-patient's mother to treating nurse were admissible pursuant to Rule 803(4) because they were "reasonably pertinent to the victim's diagnosis and treatment"). The authority cited by Defendant in its Reply—a case about statements to an amusement park employee about whether his employer had been paid for go-karts—has little relevance to this issue. *See MMG Fin. Corp. v. Midwest Amusement Park, LLC*, 630 F.3d 651, 656 (7th Cir. 2011).

[7] As above, Defendant's motion to strike the statement to Sestak as inadmissible hearsay is denied because the statement was made for the purpose of obtaining medical diagnosis or treatment. *See* FED. R. EVID. 803(4)(A); *Lovejoy*, 92 F.3d at 632.

5

patient's care." (Deposition of Moira Hoelting (hereafter "Hoelting Dep.") 14:15-17:17, Ex. 10 to Pl.'s. SOF; NMH0406, Ex. 8 to Def.'s SOF.)

According to Sestak, she and the infant's parents "had further discussions" in which the parents told Sestak that they were "worried [the infant] was not getting proper care in the NICU." Plaintiff offers no details about when or where these conversations occurred. (Sestak Decl. ¶ 15; Pl.'s SOF ¶ 17.) She does recall that she responded by explaining to the parents that she "was not a NICU nurse, but that [the infant] was in good hands and whatever can be done is being done." (Pl.'s SOF ¶ 17.) The parents then asked what they could do to help, and Sestak "discussed skin to skin and therapeutic touch" with them. (Pl.'s SOF ¶ 17.)[8]

On November 12, 2013, the infant's father sent Sestak a text message asking if she would go to the NICU to help provide "PT" for the infant. (Def.'s SOF ¶ 15.) Sestak responded that she "was busy" and "couldn't come up there," but that she would do so "after the shift." (*Id.* at ¶ 16.) She again accessed the infant's medical chart "only briefly to see if [the infant] was stable enough for skin to skin." (Pl.'s SOF ¶ 18.)[9] She contends she "only looked at the chart

---

[8] The parents' statements, like the earlier-described statements of the infant's father, also appear to fall into the Rule 803(4)(A) exception; Defendant's motion to strike paragraph 17 in Plaintiff's Statement of Facts is denied. *See* FED. R. EVID. 803(4)(A); *Lovejoy*, 92 F.3d at 632. Defendant also moves to strike paragraph 15 of Sestak's declaration on the grounds that it conflicts with Sestak's deposition testimony (*see* Def.'s Reply in Supp. of Mot. to Dismiss [86] 4-5), but Defendant has not identified any passages from Sestak's deposition testimony at all, let alone any passages that actually conflict with paragraph 15 of Sestak's declaration. (*Id.*; Def.'s Reply in Supp. of Mot. to Strike 13.) Nor is Sestak's reported discussion of possible "skin to skin and therapeutic touch" a hearsay statement.

[9] Defendant claims that Sestak "accessed Infant's medical chart over fifty (50) times." (Def.'s SOF ¶ 17.) To support this assertion, Defendant cites what appear to be electronic database entries showing separate occasions on which Plaintiff viewed the infant's medical records. (Def.'s Mot. for Summ. J. Ex. 15.) But Defendant has not provided any explanation of these records, and as best the court understands them, they document episodes that occurred within seconds of each other. The first page of the Exhibit appears, for example, to show that Plaintiff accessed the infant's records thirteen times in just over one minute, beginning at 13:05 on November 9, 2013. (*Id.*) Plaintiff maintains that she "accessed the newborn's medical charts [just] twice, once on November 9, 2013 . . . and the other time on November 12, 2013." (Pl.'s Resp. to Def.'s SOF ¶ 17.) In light of the ambiguities in the records NMH cites, Plaintiff's assertion is enough to create a genuine dispute about the number of times Plaintiff accessed the infant's medical records. NMH does not appear to dispute Sestak's

for the purpose of caring for the family, and she believed [the infant] was her patient at the time because she continued to care for the family." (*Id.*; Def.'s Resp. to Pl.'s SOF ¶ 18.)

After her shift ended on November 12, Sestak went to the NICU "intending to meet" the infant's parents "to show them skin to skin and touch therapy." (Def.'s SOF ¶ 19; Pl.'s SOF ¶ 20.)[10] Sestak walked into the area where the infant was located, but the infant's parents were not present. (Def.'s SOF ¶ 20.) Plaintiff claims that she spoke with Moira Hoelting,[11] the NICU nurse caring for the infant on November 12, who asked Sestak "what had happened" to the infant during labor and delivery. (Sestak Decl. ¶ 18.) According to Plaintiff, she "did not give Hoelting any information concerning what had happened to [the infant]" during labor and delivery. (Pl.'s SOF ¶ 22.)[12] Sestak claims she asked for and received permission from Hoelting to perform touch therapy on the infant after washing her hands. (*Id.* at ¶¶ 23-24.)

---

statement that she only accessed the infant's medical chart "briefly" on November 12. (Def.'s Resp. to Pl.'s SOF ¶ 18.) Nor does NMH dispute her statements regarding her motives for accessing the chart. (*Id.*)

[10] How exactly Sestak gained access to the NICU on November 12 is uncertain. Defendant moves to strike Sestak's statement in her declaration that "I accessed the NICU with my security badge, which allowed me to enter the NICU" (Sestak Decl. ¶ 18) on the grounds that it conflicts with her prior deposition testimony that "the door was open. So I walked into the hallway." (Sestak Dep. 144:1-2.) Sestak's declaration could be read to imply that she used her security badge to unlock the NICU door on November 12; but the declaration could reasonably be understood to mean that Sestak showed her security badge to someone in the NICU who then permitted her to enter. Such an understanding would not conflict with Sestak's deposition; she testified that her badge was visible to the NICU secretary when she entered on November 12. (Sestak Dep. 144:15-18.) The motion to strike the declaration statement is denied.

[11] The parties dispute whether Hoelting is under 40 years of age. Hoelting's actual age is not in the record. (Pl.'s SOF ¶ 21; Sestak Decl. ¶ 18; Def.'s Resp. to Pl.'s SOF 21.)

[12] According to Plaintiff, the mother "encountered a difficult delivery that was very traumatic for her" and the "newborn to whom Plaintiff gave therapeutic touch" was then "taken to the NICU." (Pl.'s SOF ¶ 15.) Defendant disputes this statement but does not deny its accuracy. Instead, Defendant moves to strike the statement as based on the mother's hearsay statements. (Def.'s Resp. to Pl.'s SOF ¶ 15; Def.'s Reply in Supp. Mot. for Summ. J. 4.) The motion is denied. It is not clear that Sestak's characterization of the mother's experience as "difficult" or "traumatic" is premised on the mother's statements at all. Even if it is, the mother's statements to Sestak would presumably be admissible because they were made for the purpose of medical diagnosis or treatment. *See* FED. R. EVID. 803(4)(A).

7

Sestak recalls that Hoelting remained by the bedside and remarked that the infant's response to Sestak's touch was "amazing." (Pl.'s SOF ¶ 25-26.)[13] Sestak then told Hoelting that she would return the following day at a time when the infant's parents were likely to be present. (*Id.* at ¶ 26.) Hoelting did not tell Sestak that her actions were inappropriate or that she shouldn't return to the NICU. (*Id.*)

In NMH's version of events, by contrast, Sestak "was already at the baby's bedside rubbing the arms and legs of the baby" when Hoelting first approached her. (Def.'s Resp. to Pl.'s SOF ¶¶ 23-24; Def.'s SOF ¶ 22.) Sestak "introduced herself to Hoelting as an L&D nurse" and "told Hoelting that she took care of Infant's mother during her stay in L&D." (*Id.*) She also informed Hoelting that she had "previously read Infant's EEG and MRI results" and "asked what the outcomes were about them." (*Id.*) Hoelting "was brief with Plaintiff" because Hoelting "was trained to respond to people asking questions about a patients [sic] status by saying the patient is 'doing well.'" (Def.'s Resp. to Pl.'s SOF ¶¶ 25-26.) The next morning, Hoelting created a "Northwestern Event Tracking System ('NETS') report regarding Plaintiff visiting Infant in the NICU." (Def.'s SOF ¶ 24.) As noted above, this report stated that a "[l]abor and delivery RN came to patient bedside in the NICU asking questions about patient's status. She said she had been reading the MRI and test results in the chart and asked specific results regarding patient's care. She said she would be back again to visit patient the next day." (NMH0406, Ex. 8 to Def.'s SOF.)

After leaving the NICU on November 12, Sestak sent another text message to the infant's father, stating that she "just went and did massage on [Infant] and will do another tomorrow." (Def.'s SOF ¶ 25.) The following day, Sestak again texted the infant's father, this

---

[13] Defendant moves to strike Sestak's testimony about Hoelting's response as hearsay. (Def.'s Reply Supp. Mot. to Strike 8-9.) The statement is likely admissible, however, as a statement by Defendant's "agent or employee on a matter within the scope of that relationship and while it existed." FED. R. EVID. 801(d)(2)(D). In any event, Hoelting's statements do not appear to be offered for their truth, but to show that Plaintiff had no reason to believe at the time that her actions were inappropriate.

8

time stating that she would "come by the [NICU] tonight" and that it was "better to do it after hours when it is quieter." (*Id.*) After Sestak's shift ended on November 13, she again "used her badge" to enter the NICU. (Def.'s SOF ¶ 27.) Unlike the previous day, Sestak was not wearing her nursing uniform when she entered the NICU. (*Id.*) This time, at the request of NICU manager Tim Rog, Sestak left the NICU and did not return. (Pl.'s SOF ¶ 27.) NICU nurse Deb Bafia later created a NETS report concerning the incident. (Def.'s SOF ¶ 30; Pl.'s Resp. to Def.'s SOF ¶ 30.) The report stated, among other things, that Bafia "was standing at patient's bedside, when a lady in street clothes walked in asked me if I was the pateint's [sic] nurse, then she began to scrub in." (NMH 0408, Ex. 8 to Def.'s SOF.)[14]

In November 2013, Melissa Kelley and Sue Fulara were Sestak's direct supervisors in the Labor and Delivery Department. (Def.'s SOF ¶ 7.) Kelley, in turn, reported to Kim Armour, NMH's Director of Women's Health. (*Id.* at ¶ 8.) By November 14, supervisors had become aware of the events described above (the record does not say how), and asked Sestak to attend a meeting with Armour and Kelley, as well as Alexander Masten (NMH's Compliance Program Coordinator) and Eric McGee (a Human Resources consultant assigned to the Labor and Delivery Department). (Pl.'s SOF ¶¶ 29-30; Def.'s SOF ¶¶ 31-35.)[15] The purpose of the meeting was to determine whether Sestak's actions "warranted disciplinary action" or resulted in a "reportable breach" of the Health Insurance Portability and Accountability Act ("HIPAA"). (Def.'s SOF ¶ 35.) That Act generally prohibits unauthorized access to or disclosure of private medical information.

The parties dispute what was said at this meeting. According to Sestak, the discussion focused "almost entirely" on her "viewing the medical charts" of the infant. (Pl.'s SOF ¶ 32.)

---

[14] The report also stated that Sestak "began to massage the infant." (NMH 0408, Ex. 8 to Def.'s SOF.) Sestak asserts that she did not touch the infant on November 13, and Defendant does not dispute Sestak's assertion. (Def.'s Resp. to Pl.'s SOF ¶ 27.)

[15] Defendant claims that Tony Manderschied, NMH's Manager of Corporate Compliance and Integrity, also attended this meeting. (Def.'s SOF ¶¶ 31, 33.) Plaintiff disputes this, but concedes that it is a "minor detail." (Pl.'s Resp. to Def.'s SOF ¶ 31.)

9

"No one said anything at the meeting about touch therapy being inappropriate or violating any policy." (*Id.*) Sestak told the group that the infant's father had given her permission to look at the infant's medical charts, and she showed the father's text messages to Masten and McGee. (Pl.'s SOF ¶ 31.)[16] According to Sestak, after hearing Sestak's explanation and reviewing the text messages, Masten concluded that "there was no violation of HIPAA." (*Id.* at ¶ 32.) Kim Armour then moved the conversation away from the narrow question of whether Sestak violated HIPAA. According to Sestak, Armour stated that "'older nurses' often have difficulty understanding when the mother and baby become separate patients." (*Id.* at ¶ 33.) Armour then told Sestak "that she was sorry but she had to make an example of [Sestak]." (*Id.*) Sestak's account is corroborated by handwritten notes that she made in her personal calendar "immediately following the meeting" on November 14. (Sestak Decl. ¶ 27; Sestak Dep. 33:12-24.)[17] At the close of the meeting Armour told Sestak to report for her shift the next day as usual. (*Id.* at ¶ 34; Deposition of Alexander Masten (hereafter "Masten Dep.") 23:11-25:13.) The next morning, however, Kelley called Sestak and told her that she was "suspended" and should not come to work. (Pl.'s SOF. ¶ 34.)

NMH denies that Kelley, Armour, Masten, and McGee "were entirely focused on Plaintiff viewing Infant's charts." (Def.'s Resp. to Pl.'s SOF ¶ 32.) It also denies that Masten announced that no HIPAA violation occurred or that Armour made a comment about "older nurses." (*Id.* at ¶¶ 32-33.) Instead, NMH maintains that Armour told Sestak that if she "felt she couldn't critically think through the boundaries that [Plaintiff] was being upheld to, that any prudent nurse would

---

[16] Sestak also asserts that she told the group "that Hoelting [had] asked questions about what happened in labor delivery, but Ms. Sestak did not tell her anything." (Pl.'s SOF ¶ 31.)

[17] These notes attribute several statements to "KA," including the following: "Maybe before you could look in chart before EMR, but things are different now Older nurse may not understand baby/mom separation . . . . Sorry its happening to you Mary but Im going to make an example out of you for the rest of the staff." (Sestak Decl. Ex. 35.)

be upheld to, that maybe it's important that we go and do some education and training." (*Id.* at ¶ 33.)[18]

The parties also dispute what happened after the meeting. According to Sestak, "Armour made [the] decision to terminate Ms. Sestak on November 18, 2013." (Pl.'s SOF ¶ 36.) Armour did so, Sestak contends, "without looking at any of [Sestak's] past evaluations" and before receiving "documents reflecting Ms. Sestak's access to the baby's medical charts." (*Id.* at ¶ 37.) Although Armour's decision to terminate was finalized on November 18, Sestak continues, it was not communicated to Sestak until November 22. (*Id.* at ¶ 39.) In the interim, Eric McGee wrote an e-mail to Armour and others who had attended the November 14 meeting suggesting that the attendees should be "on the same page" concerning the reasons for terminating Sestak. (*Id.* at ¶ 38.)

To support her account of the timing of the discharge decision, Sestak cites Eric McGee's testimony that the decision "would have been made per Kim Armour's e-mail on the 18th." (Deposition of Eric McGee (hereafter "McGee Dep.") 30:9-13, Ex. 6 to Pl.'s SOF.)[19] Sestak also provides the e-mail to which McGee presumably refers: In this November 18 message, Armour explained to McGee, Masten, Kelley, and Fulara (among others) that "[a]fter much consideration and discussing our situation regarding the breech [sic] of HIPAA into the newborn record as well as an RN providing newborn massage (off the clock & out of scope of practice) we would like to cease offering hours of employment with this casual employee . . . . [W]e'd like to know our next steps to advise her that we will not be in need of her

---

[18] NMH also "denies that Plaintiff['s] badge was reactivated after it was deactivated," but Sestak does not make any claim as to whether her badge was actually "reactivated after it was deactivated." Rather, she claims that she was *told* at the close of the meeting that her badge would be reactivated. (Pl.'s SOF ¶ 34.)

[19] Sestak also cites a passage from Melissa Kelley's deposition in which Kelley testifies that "HR and Kim Armour" informed Kelley by phone of "the conclusions from corporate integrity . . . . [t]o move forward with the termination based on their investigation." (Deposition of Melissa Kelley (hereafter "Kelley Dep.") 45:8-18, Ex. 9 to Pl.'s SOF.)

11

service any longer. [P]lease advise." (McGee Dep. Ex. 3.) McGee responded, also on November 18, 2013: "Kim, We would write up a terminating disciplinary action report which I can do and then the department would bring her in the issue to discharge. I would need some more detailed information on times and dates for her access to the medical record and patient to complete the disciplinary action. Also I think it might be good for us to all be on the same page with the noted reason for termination." (*Id.*)[20]

NMH disputes Sestak account about the timing of the decision and identity of the decision makers. According to NMH, "[t]he decision to terminate Plaintiff was made collectively by Armour, Kelley, Masten, and McGee." (Def.'s Resp. to Pl.'s SOF ¶ 36.) This decision was not made on November 18, NMH asserts, but rather on November 22—the same day Sestak learned of it. (Def.'s SOF ¶ 42.) Even if Armour did make the decision, NMH maintains, she did so based on an "investigation" that involved her own "review of patient records, badging records, NETS Reports, and Armour's discussions with Plaintiff where Plaintiff refused to acknowledge that there was an issue with Plaintiff's actions." (Def.'s Resp. to Pl.'s SOF ¶ 37.) And regardless of who made the decision, Defendant claims it was made "because NMH determined that she: (1) violated NMH's Privacy and Confidentiality Policy; (2) violated NMH's Rules for Personal Conduct;[21] and (3) performed work outside the scope of an L&D nurse."[22] (Def.'s SOF ¶ 44.)

---

[20] Defendant argues that Sestak failed to properly authenticate McGee's e-mail (Def.'s Resp. to Pl.'s SOF ¶ 38), but Defendant itself notes a passage from McGee's deposition in which McGee explains why he wrote the phrase that Sestak quotes. (*Id.*; McGee Dep. 26:5-22.) In light of McGee's apparent acknowledgement in this passage that he did, in fact, write the message, the court declines to strike it from the record.

[21] Section II(B)(2) of NMH's Rules for Personal Conduct prohibits NMH employees from "disobeying instructions, procedures, or policies, whether through neglect, procrastination or deliberate disobedience." (Dep. of Kim Armour (hereafter "Armour Dep.") Ex. 4, Ex. 3 to Def.'s SOF.) Section II(B)(21) of these rules prohibits NMH employees from "[m]isusing confidential information, including protected health information ('PHP') about employees, patients, their families, physicians, or other individuals associated with Northwestern Memorial." (*Id.*) The section defines "misuse" to include, "without limitation, accessing confidential

Though NMH contends that Kelley participated in the termination decision, the deposition passages NMH cites do not directly support that contention. Kelley testified at one point that the investigation into Sesak's conduct "was held above me." (Kelley Dep. 60:12-17.) In a second passage, Kelley states that the decision to terminate Sestak was made by "executive leadership and corporate integrity. I don't know who specifically. It was a decision made above my level." (*Id.* at 43:9-18.)

NMH also cites a form titled "NMH HIPAA Breach Analysis and Risk Assessment Tool," dated December 16, 2013, which refers to "a lengthy, ongoing investigation and numerous conversations with management in the Labor and Delivery Department, conversations with Human Resources, and finally conversations with Mary Sestak." (Deposition of Alexander Masten (hereafter "Masten Dep.") Ex. 2, Ex. 6 to Def.'s Resp. to Pl.'s SOF.) Alexander Masten testified that he drafted this portion of the form, but his knowledge of the investigation was based only on "the meeting that we had with Mary and those other folks." (*Id.* at 36:1-24.) NMH cites testimony of Eric McGee that it was "all of our opinions" that Sestak had violated the hospital's privacy and confidentiality policy. Similarly, the decision that Sestak had violated the hospital's rules for personal conduct was made by "the group, the director, the manager, myself.

---

information for other than legitimate business reasons" and "disclosing confidential information to unauthorized individuals." (*Id.*)

[22] The parties dispute the "scope" of a Labor and Delivery nurse's work at NMH. Sestak states in her declaration that "I have on many occasions been asked to give care to babies in NICU, and I regularly promote, teach and perform skin to skin and touch therapy on babies in labor and delivery, no different than what I did for [the infant] in the NICU." (Sestak Decl. ¶ 20.) NMH disputes that Sestak was asked to "give care" in the NICU, "because the only procedures Plaintiff performed in the NICU were providing mothers with breastfeeding help and showing mothers skin to skin." (Def.'s Resp. to Pl.'s SOF ¶ 9.) Sestak also claims that NMH does not have any written policy "that requires a nurse to obtain a doctor's order to touch or massage a patient." (Pl.'s SOF ¶ 8.) Though NMH has not asserted that it has an explicit policy on this issue, NMH contends that "touch[ing]" the infant constituted a violation of Section II(B)(2) of NMH's Rules for Personal Conduct, quoted above. (Def.'s Resp. to Pl.'s SOF ¶ 8.) NMH asserts, further, that nurses are expected to follow a doctor's orders, though it does not claim that a doctor ordered Sestak not to touch the infant. (*Id.*)

I think the senior VP was involved, and, again, in my opinion, it was a violation, and I think everyone concurred." (McGee Dep. 36:1-20.)

Sestak filed a charge of discrimination with the Equal Employment Opportunity Commission on May 6, 2014. (Def.'s SOF ¶ 2.) The EEOC issued a Dismissal and Notice of Rights on March 31, 2016, and Sestak filed this suit on June 20, 2016. (*Id.* at ¶¶ 2-3.) Defendant now moves for summary judgment under Rule 56 of the Federal Rules of Civil Procedure.

## **DISCUSSION**

To prevail on a motion for summary judgment, the moving party must demonstrate that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." FED. R. CIV. P. 56(a). The materiality of a fact depends on its relation to the underlying claim. *Zaya v. Sood*, 836 F.3d 800, 804 (7th Cir. 2016) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A dispute is genuine where "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id*.

In all employment discrimination cases, the "proper question to ask" at the summary judgment stage "is 'whether the evidence would permit a reasonable factfinder to conclude that the plaintiff's race, ethnicity, sex, religion, or other proscribed factor caused the discharge or other adverse employment action.'" *Ferrill v. Oak-Creek-Franklin Joint School District*, 860 F.3d 494, 499 (7th Cir. 2017) (quoting *Ortiz v. Werner Enterprises, Inc.*, 834 F.3d 760, 765 (7th Cir. 2016)). Evidence that a proscribed factor caused an adverse employment action "must be considered as a whole, rather than asking whether any particular piece of evidence proves the case by itself." *Ortiz*, 834 F.3d at 765.

The parties do not dispute that Sestak was protected by the ADEA when she was fired. (Def.'s Mot. for Summ. J. 9.) Nor do they dispute that she suffered an adverse employment action. (*Id.*) Rather, they dispute whether the plaintiff has presented sufficient evidence that age was the reason for her discharge. Sestak points to numerous factual disputes relating to

14

this issue, including: (1) whether Kim Armour made an age-related comment at the November 14 meeting; (2) whether NMH treated Moira Hoelting more leniently than Sestak despite Hoelting's alleged participation in the incident on November 12, 2013;[23] (3) whether NMH generally gave "preferential treatment" to younger nurses; (4) whether Sestak was meeting NMH's legitimate expectations at the time of her termination; and (5) whether NMH engaged in a "shoddy" investigation into the incidents of November 9 through November 13, 2013. (Pl.'s Opp. to Def.'s Mot. for Summ. J. 10-16.) As explained below, the court concludes that the dispute about the alleged age-related comment is sufficient on its own to defeat Defendant's Motion for Summary Judgment.

## II.     Statement by Kim Armour

Sestak states in her declaration that Kim Armour told her at the November 14 meeting that "older nurses have difficulty understanding when the mother and baby become separate patients, and that [Armour] was sorry but she had to make an example of me." Sestak Decl. ¶ 25. Sestak also points to her "contemporaneous notes" that "memorialized those comments." (Pl.'s Opp. to Mot. for Summ. J. 10.)[24] Armour's words were not a "stray comment made by a random employee," Sestak urges. (*Id.*) Rather, they provide evidence that the person who decided to terminate Ms. Sestak made an "age-related comment," and did so "in temporal proximity" to that decision. (*Id.*)

---

[23] Sestak suggests that Hoelting participated in the incident by "asking invasive questions about what happened to the baby in labor and delivery that were not relevant ot the baby's care" and by "allow[ing]" Sestak to perform touch therapy on the infant. (Pl.'s Opp. to Def.'s Mot. for Summ. J. 10.) As evidence of Hoelting's allegedly "invasive" questions, Sestak cites her own testimony that on November 12 Hoelting "asked me what had happened with Baby A in labor in delivery. She said we get patients up here in NICU all the time and we always wonder what happened." (Sestak Decl. ¶ 18.) As noted above, Sestak maintains that she "did not give Hoelting any information concerning what had happened to Baby A." (*Id.*)

[24] NMH moves to strike these notes on the grounds that they are not properly authenticated. (Def.'s Reply in Supp. of Mot. for Summ. J. 6.) But Sestak testified that the notes are hers and that she wrote them "immediately following the meeting" on November 14. (Sestak Decl. ¶ 27.) *See* FED. R. EVID. 901(b)(1). The motion to strike is denied.

NMH denies that Armour made these comments (Def.'s Reply Mem. in Supp. of Mot. for Summ. J. 7), but the denial shows that there is a genuine dispute about this. NMH's real argument is that the dispute doesn't pertain to a "material" fact, because "[e]ven if true, these alleged statements" are not enough to "create an inference that Plaintiff was fired because of her age." (*Id.*) In support of this argument, NMH cites *Ransom v. CSC Consulting, Inc.*, 217 F.3d 467 (7th Cir. 2000), a case brought by a former company vice president fired less than two years after he was hired. As evidence that the decision reflected age discrimination, the plaintiff in *Ransom* cited a statement from CSC's CEO that the company needed to "refresh the officer group" in order to "keep the younger people from leaving." *Id.* at 469. Affirming summary judgment, the Seventh Circuit held that the CEO's statement was insufficient, on its own, to support an inference of age discrimination. The CEO's statement referred to a "'promote and eliminate' dynamic that had 'always' been in play at the companies where he worked, including CSC, A.T. Kearney, and Morgan Stanley." *Id.* "Direct evidence" of age discrimination, the court observed, "'must not only speak directly to the issue of discriminatory intent, it must also relate to the specific employment decision in question.'" *Id.* at 468 (quoting *Baron v. Highland Park*, 195 F.3d 333, 339 (7th Cir. 1999)).

NMH analogizes Kim Armour's alleged statements to the CEO's statements in *Ransom*, characterizing them as "general observations about the nursing behavior at NMHC, rather than a direct explanation about Plaintiff's termination." (Def.'s Mem. in Supp. of Mot. for Summ. J. 7.) The analogy is not compelling. Unlike the CEO in *Ransom*, Armour allegedly said that that she "had to make an example" of Sestak. (Sestak Decl. ¶ 25.) This language explicitly connects Armour's concern about "older nurses" to the question of how NMH should respond to Sestak's actions between November 9 and November 13, 2013. Nothing in *Ransom* suggests that the CEO similarly connected his general comment about "younger people" to the decision to fire the plaintiff in that case.

NMH also argues that Sestak's interpretation of the phrase "older nurses" is "subjective," and therefore insufficient to support an inference of discrimination. (Def.'s Mem. in Supp. of Mot. for Summ. J. 7.) It is true that the "subjective beliefs" of a plaintiff cannot, without more, "create a genuine issue of material fact." *Mills v. First Federal Sav. & Loan Ass'n*, 83 F.3d 833, 841 (7th Cir. 1996) (citing *McMillian v. Svetanoff*, 878 F.2d 186, 190 (7th Cir. 1989)). But Sestak's interpretation of Armour's alleged statements in this case is not nearly as subjective as those in cases where the court found summary judgment to be appropriate. In *Mills*, for example, one of the plaintiff's supervisors expressed concern that she "might not be able to keep up" with her job duties. 83 F.3d at 841. This supervisor made no reference to her age. *Id*. Rather, the plaintiff herself "subjectively perceived these comments as age related" when "they were not necessarily so." *Id*. Although another supervisor did state, at a different meeting, that the plaintiff "would have a terrible time getting another job because of [her] age," this supervisor "was trying to express empathy and understanding concerning the plaintiff's predicament." *Id*. at 42. The remark did not have "any discriminatory undertones." *Id*.

Kim Armour, on the other hand, made explicit reference to "older nurses" as having trouble understanding a practice standard, as well as her own belief about the need to "make an example" of Sestak as a result of this trouble. (Sestak Decl. ¶ 25.) It is, of course, possible to interpret this statement as simply identifying one common trait among nurses who shared Sestak's difficulty meeting NMH's expectations. But the statement can also fairly be interpreted in a way that makes age the driving force behind Armour's decision to fire Sestak. At the very least, there are multiple reasonable interpretations of the statement. Sestak's case, therefore differs from *Mills*, where the "only . . . reasonable interpretation" was that the plaintiff's supervisors' comments were benign. 83 F.3d at 841.

Armour allegedly made an age-related comment in a meeting focused entirely on Sestak's actions at NMH, rather than in a general conversation about the human resources policies of multiple corporations or about the challenges of being an older job applicant. Armour

17

explicitly connected that age-related comment to the question of how NMH should respond to Sestak's conduct. Four days later, Armour allegedly made the decision to terminate Ms. Sestak's employment. These facts are enough to distinguish Sestak's case from *Ransom* and *Mills*. A reasonable jury could conclude on the basis of this evidence that Plaintiff was fired because of her age. *See Fakete v. Aetna, Inc.*, 308 F.3d 335, 339 (3d Cir. 2002) (reasonable jury could find that interviewer's statement to plaintiff that the company preferred "younger single people" was "a clear, direct warning . . . that [plaintiff] was too old to work for [defendant]").

## **CONCLUSION**

Because Defendant has failed to show the absence of any genuine dispute about a fact that is material to Plaintiff's claim, its motion for summary judgment [36] is denied. Plaintiff's motion to set a briefing schedule on evidentiary objections [87] is terminated as moot.

ENTER:

Dated: November 28, 2017

REBECCA R. PALLMEYER
United States District Judge